MILLS, Justice,
for the Court:

STATEMENT OF THE CASE

¶ 1. Today we once again address the matter of Robert Charles Robb, III and his fitness to practice law. This Court suspended Robb from the practice of law in the State of Mississippi for six months on June 20, 1996. Mississippi Bar v. Robb, 684 So.2d 615 (Miss.1996). We remanded his petition for reinstatement for a full evidentiary hearing on November 26, 1997. See In re Petition of Robb, 702 So.2d 423 (Miss.1997). The Complaint Tribunal filed its Findings of Fact and Report to this Court on February 23, 1998. We now must determine whether to reinstate Robb to the practice of law.

DISCUSSION

¶2. “The function of the reinstatement petition is to determine whether the attorney has complied with the terms of the suspension order and whether he has otherwise appropriately conducted himself.” Haimes v. Mississippi State Bar, 551 So.2d 910, 912 (Miss.1989) (construing Rule 12, Rules of Discipline).
¶ 3. We are satisfied that Robb has met the minimum requirements of complying, if begrudgingly, with the specific terms of his suspension order. However, the proof is less than compelling that he has appropriately conducted himself in the interim following his suspension.
¶ 4. This cause was remanded to the Complaint Tribunal for findings of fact due to our concern regarding a gun incident involving Robb and Gloria Fisher at a Delchamps grocery during his suspension period. Robb was deposed on February 11, 1997 by the Mississippi Bar. Under oath, Robb described the Delchamps incident as follows:
A. That’s either a Tuesday or Wednesday, as I recall. And I walked into the back and there were two ladies back there. Gloria was kind of into my front, and the other lady was to the left. And I held up the doughnuts. I said, Gloria, are these day-old doughnuts? Don’t you have any *1219 thing fresh? And she said, What? And I said, We need some day-old doughnuts. About that time my — the pistol, because I had some problems with it, started slipping. I pulled — it has a spring in it. I think you’re familiar with the gun. It has a spring up in the barrel. You know, it was forcing its way through, and it was about to come apart. And I pulled it out and I stuck the pistol, the barrel — not the barrel, but the front of the gun into my side to push the spring back up in it and stuck it in my belt.
And about that time Gloria said, Ooh, wee, what is that? And I said, Have you got some doughnuts? She said, Let me see that. She walked around up to me and she said, Let me see that. I said, No, no, no. You know, you might hurt yourself. It was kind of a knee-jerk response. Even though the gun wasn’t loaded and didn’t have a barrel in it, the response was, you know, you don’t play with guns, especially somebody like that who is not familiar with it.
So I said, I need a half a dozen doughnuts. And she said, Why don’t you get— she said, Okay, I’ll cook you some. I’ll fix you some. We don’t have any. I said, Well, Gloria, cook me some, you know. I said, She’s working — the lady that was there with her, I pointed. I said, She’s got some there. Give me a half dozen of those. She said okay.
And I walked out and back around the counter, and she came out to the counter and said, Why don’t you get a dozen? And I said, Why? She said, Because six is $2 and a dozen in $1.99. What am I going to do with a dozen? I said, Okay. Well, put them in two bags. I was going to go back to the Delta Ford, and the woman who is the finance manager there — I guess that’s what her title is — is a friend of mine. I thought, Well, I’ll just take her a half dozen doughnuts and take my own half with me. Well, I got the doughnuts.
One of the assistant managers came up and asked me about the gun, and I told him, you know, there wasn’t any problem, everything is okay. He said okay. She gave me the doughnuts. Oh, and while she was getting the doughnuts, he was there. I walked to the back of the store and got a quart of milk. I might have got a pint of milk. Came back to the front and she had the doughnuts, and she gave me the ticket and everything. I went out the front door and that was it.
Q. Did you point the gun at her?
A. No, sir, I did not. That is absolutely not correct. I did not do that. Not even in play. Not even without a barrel, not even without cartridges in it. That’s — I don’t play with firearms. I’ve never done that. I went back to—
Q. Did you say anything to her about shooting her?
A. No, sir, I did not. I did not, never. The only thing that she — if anything, she misinterpreted when I said — when she wanted to come look at the pistol, if she wanted to come touch it or do something, I said, No, you might shoot yourself. It’s kind of a response I’d make to anybody when they start coming around a firearm. If they don’t — unless it was somebody I knew well, I certainly wouldn’t hand anybody a firearm loaded or unloaded or even in that condition. That’s how people get hurt literally with doing those type of things.
And I took the gun apart for the specific purpose of not having a concealed weapon, not having a weapon in my hand. I left the barrel in the car, so it was not a functional firearm.
I went back and took the doughnuts up to the lady at Delta Ford and went out and waited a little while longer. And I called my wife and I said, The courtesy car is not here yet. I said, Come get me and just take me to the house, you know, and we’ll just get the car later this afternoon or tomorrow night. So she did.
¶ 5. Upon remand, the Complaint Tribunal found as follows regarding this incident:
In September of 1996 at approximately 8:00 A.M. Petitioner had taken his wife’s automobile to a repair agency in Vicksburg, Mississippi to be left for some type of repair work. A Colt 45 caliber automatic pistol, normally carried in the vehicle by Petitioner or his wife, was removed by *1220 Petitioner, dissembled by removing the barrel, and the remaining portion of the eight inch weapon was placed by Petitioner in his waistband of his casual slacks or blue jeans. Petitioner then walked approximately 100 yards to the deli located in a nearby Delchamps store to purchase doughnuts while awaiting a courtesy car for transportation. Petitioner was known to the personnel at the deli where he had frequently purchased doughnuts as a normal morning routine.
Gloria Fisher was manager at the deli. After entering the deli Petitioner went into the area of the store where doughnuts were fried and pastries baked. There he confronted Gloria and apparently attempted to tease her about her being late. Defensively, Gloria told him "... I didn’t want to fool with him.” Gloria had in actuality been late at some previous time unbeknown to Petitioner who then pulled the .45 automatic pistol and pointed it at her and said “I’ll shoot you.” Petitioner then went into another section of the store, picked up some milk, returned to the deli area and paid for the doughnuts and milk and left.
The events and dialogue were witnessed by Cheryl Washington, another deli employee, who reported the incident to Ricky Bourg, assistant manager at the store. Bourg telephoned the home office of Del-champs. Based upon that conversation it was decided Delchamps could not file criminal charges but the individual involved in the incident could and Delchamps would back her up. It was also decided Petitioner would be barred from the store in the future.
Bourg discussed the position of Del-champs with Gloria and then accompanied her to the Vicksburg Police Department where an affidavit of the affair was signed by Gloria charging Petitioner with carrying a concealed weapon and simple assault. Petitioner received a telephone call from the Vicksburg Police about the impending arrest and voluntarily went to the police department accompanied by his wife, Ann Robb, and posted bond after the arrest. Petitioner was represented by Eugene A. Perrier in Vicksburg City Court on the matter. Prior to the trial date, Ann Robb contacted Gloria Fisher in an effort to get her to drop the charges, and was told Gloria wanted a car or money to drop the charges. Neither was furnished or paid. Petitioner prepared an affidavit which Gloria signed at Perrier’s office, Exhibit 7, which described the incident at the deli as a misunderstanding. On the day of the trial, Gloria appeared and the charges were dismissed upon her request. The $50.00 court costs normally charged to an affiant were paid by Perrier from his attorney’s fees. Neither the Vicksburg City Prosecutor nor Municipal Judge considered prosecuting the misdemeanor charges further when presented with Gloria’s desire not to proceed.
Petitioner was verbally informed he was barred from the Delchamps store by Ricky Bourg which prohibition he has honored. Gloria Fisher had thought of Petitioner as “... a real nice person” prior to the incident with the gun. She had been shot in the leg with a gun when she was 18 years old and is now scared of guns. She did not know the weapon had been dismantled at the time of the incident. She does not now believe Petitioner meant her harm with the gun, but was told by friends that she could sue over the incident and thought about asking for a car in return for dropping the charges against Petitioner. Petitioner acknowledged using poor judgment and that he was not thinking when he carried the gun into Delchamps.
¶ 6. The Tribunal then discussed its view of the importance of this incident as follows:
As to the incidents cited by the Mississippi Bar Association in determining whether the public has been fully vindicated and Petitioner shown to possess the requisite moral character to be reinstated, the Tribunal finds the first incident [the gun incident] to be the more troubling in terms of gauging Petitioner’s ability to work with the public and bar as a practicing attorney.
The Tribunal finds the incident based on actions where the Petitioner admits he was not thinking and where poor judgment was *1221 exercised. However, on balance, no direct testimony was presented which indicated Petitioner intended to harm Gloria Fisher, or anyone, with the gun. Rather, it seems clear and convincing that the past association of Petitioner and the employees of the Delchamps Deli was informal at best and his use of a gun, even in jest or play, was directed toward an individual who was least able to be confronted with a gun as she was without creating the worst fear of what a gun represented. Such conduct is certainly reprehensible for a member of the bar and a misdemeanor. While Gloria Fisher’s motive in filing the charges is questionable as to whether she felt she had to sign the affidavits for Delchamps, as she was accompanied by her superiors, or whether she was so personally aggrieved by Petitioner’s action that she wanted to protect society from further confrontations or seek damages, it is apparent the prosecutor and municipal judge of Vicksburg did not deem the incident sufficiently serious to pursue further in light of Gloria Fisher’s desire not to proceed.
¶ 7. Robb’s account of this troubling event is noticeably different from the account given by the other witnesses. However, we presume that Robb testified truthfully since the Bar has failed to challenge the inconsistencies between the varying accounts of the incident. Though Robb has been banned from going into the Delchamps store, the record does not establish that he ever intended to harm Mrs. Fisher and we can only hope that this aberrant incident was isolated and that Robb has gained some wisdom from his experiences.'
¶ 8. The Tribunal also notes that one of the letters of recommendation for Robb’s reinstatement characterizes him by stating that, “Charlie does have a unique personality which, at times, can be and has been offensive to others in the legal community without Charlie even realizing .” The Tribunal stated that, “[i]f this candid description by Petitioner’s own supporter accurately reflects his aggressive style it also shows how his actions have resulted in his current dilemma.”
¶ 9. The Tribunal concludes by finding:
Understanding there is not as great a burden of proof upon a suspended attorney seeking reinstatement as for one disbarred, it is the report of the Complaint Tribunal that Petitioner, Charles Robb, III, has by any minimal standards, shown the four incidents cited by the Mississippi Bar Association should not be an impediment to his ability to show his rehabilitation and contrition to past practices to enable him to be reinstated to the practice of law. If his apology to the Court and noted contrition are sincere, his poor past judgments and unique personality must, at a minimum, use his past as a message for improvement if he is to be give[sic] an opportunity to continue to use his legal education and training as an attorney at the bar.
¶ 10. We place great weight on the findings of the Complaint Tribunal and note its somewhat less than ringing endorsement of reinstatement.
¶ 11. This Court would prefer to announce that we only reinstate attorneys to the practice of law in whom we place such confidence that we would readily recommend them to family, friends or associates for professional advice and representation. However, such a standard does not now exist and would likely prove to be too subjective in application. As we have before stated, the burden of proof for reinstatement of a suspended attorney is not the same or as great as that demanded of one who has been disbarred. Haimes v. Mississippi State Bar, 551 So.2d 910, 912 (Miss.1989). Robb was not disbarred in our initial consideration of his case, and though his record since suspension has been less than exemplary, we are compelled to find that he has met the absolute minimum standards to establish his rehabilitation in conduct and character sufficient to entitle him to once more wear the mantle of attorney-at-law. We therefore grant the petition of Robert Charles Robb, III, for reinstatement as a member of the Mississippi Bar.
¶ 12. PETITION OF ROBERT CHARLES ROBB, III, FOR REINSTATEMENT TO PRACTICE LAW GRANTED.
*1222 PRATHER, C.J., SULLIVAN and PITTMAN, P.JJ., and JAMES L. ROBERTS, Jr., SMITH and WALLER, JJ., concur.
BANKS and McRAE, JJ., concur in result only.